## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION *et al*.,

               Plaintiffs,

   v.

CENTRAL INTELLIGENCE AGENCY,

               Defendant.

No. 1:11-cv-0933 (ABJ)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation hereby oppose Defendant Central Intelligence Agency's motion for summary judgment and cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

  /s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com

  /s/ Mitra Ebadolahi
Mitra Ebadolahi (*pro hac vice*)
Alexander A. Abdo (*pro hac vice*)
Jameel Jaffer (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7305
Fax: (212) 549-2654
mebadolahi@aclu.org

February 17, 2012

aabdo@aclu.org
jjaffer@aclu.org

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION *et al.*,

                Plaintiffs,

    v.

CENTRAL INTELLIGENCE AGENCY,

                Defendant.

No. 1:11-cv-0933 (ABJ)

# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
# AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com

Mitra Ebadolahi (*pro hac vice*)
Alexander A. Abdo (*pro hac vice*)
Jameel Jaffer (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7305
Fax: (212) 549-2654
mebadolahi@aclu.org
aabdo@aclu.org
jjaffer@aclu.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. i

INTRODUCTION ........................................................................................... 1

PROCEDURAL HISTORY ............................................................................... 4

APPLICABLE LEGAL STANDARDS ............................................................... 6

ARGUMENT ................................................................................................. 9

I.  The CIA Cannot Rely on Exemption 1 or Exemption 3 to Withhold
    Descriptions of Unauthorized Techniques. ....................................... 9

    A.  *The OIG Reports Describe Unauthorized Activities That Fall Outside
        the CIA's Mandate and Thus Cannot Be Withheld Under Exemptions 1
        or 3.* ............................................................................................ 11

    B.  *Release of Descriptions of Unauthorized Techniques Will Not Endanger
        National Security.* ........................................................................ 15

II. The CIA Has Failed to Establish that Exemption 5 Applies to the Withheld
    Reports. ............................................................................................. 17

    A.  *The Documents Withheld Are Not Predecisional.* ............................. 19

    B.  *The Documents Withheld Are Not Deliberative.* ............................... 23

    C.  *The Withheld Information Contains Segregable Factual Information to
        which the Deliberative Process Privilege Does Not Extend.* .............. 25

III. Exemption 7 Does Not Apply to the Withheld Reports. ...................... 26

    A.  *The CIA Has Not Established That the OIG Reports Were Compiled for
        Law Enforcement Purposes.* ............................................................ 26

    B.  *Release of the OIG Reports Would Not Interfere with Enforcement
        Proceedings.* ................................................................................. 28

IV. Given the Deficiencies in the CIA's Declaration and *Vaughn* Index, the
    Court Should, at a Minimum, Conduct an *In Camera* Review of the OIG
    Reports. ............................................................................................. 30

CONCLUSION ............................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Access Reports v. Dep't of Justice*, 926 F.2d 1192 (D.C. Cir. 1991) ..................................... 19, 23

*ACLU v. Dep't of Def.*, 628 F.3d 612 (D.C. Cir. 2011) ................................................. 14

*Alexander v. FBI*, 192 F.R.D. 42 (D.D.C. 2000) ........................................................ 18

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980), *abrogated on other grounds by Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983) ................................................. 8

*Assembly of State of Calif. v. Dep't of Commerce*, 968 F.2d 916 (9th Cir. 1992) ....................... 21

*Campbell v. Dep't of Health and Human Servs.*, 682 F.2d 256 (D.C. Cir. 1982) ........................ 29

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) ................................................. 27, 30

*CIA v. Sims*, 471 U.S. 159 (1985) ......................................................................... passim

*City of Virginia Beach v. Dep't of Commerce*, 995 F.2d 1247 (4th Cir. 1993) .......................... 21

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ..................... passim

*Ctr. for Auto Safety v. EPA*, 731 F.2d 16 (D.C. Cir. 1984) .............................................. 31

*Dellums v. Powell*, 642 F.2d 1351 (D.C. Cir. 1980) ..................................................... 8

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ........................................................ 6

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) .......................... 6

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ................. 6

*FBI v. Abramson*, 456 U.S. 615 (1982) ................................................................... 28

*Fed. Trade Comm'n v. TRW, Inc.*, 628 F.2d 207 (D.C. Cir. 1980) ...................................... 18

*Gutman v. Dep't of Justice*, 238 F. Supp. 2d 284 (D.D.C. 2003) ...................................... 22

*In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740 (D.C. Cir. 2006) ................................................................................ 18

*Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994) ............................................................... 31

*Juarez v. Dep't of State*, 518 F.3d 54 (D.C. Cir. 2008) ................................................ 28

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*, ___ F. Supp. 2d ____, No. 11-00604
   (CKK), 2012 WL 251914 (D.D.C. Jan. 27, 2012) ............................................................ 7, 18

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006) ....................................................... 19

*Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987) ....................... 19, 21, 22, 24

*Kay v. FCC*, 976 F. Supp. 23 (D.D.C. 1997) ............................................................................... 28

*Kimberlin v. Dep't of Justice*, 139 F.3d 944 (D.C. Cir. 1998)..................................................... 28

*King v. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ............................................................... 8

*Landmark Legal Found. v. IRS*, 267 F.3d 1132 (D.C. Cir. 2001) ................................................. 8

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)........................................................... 7, 8

*Linn v. Dep't of Justice*, No. 92-1406, 1995 WL 631847 (D.D.C. Aug. 22, 1995)..................... 30

*Lykins v. Dep't of Justice*, 725 F.2d 1455 (D.C. Cir. 1984) .......................................................... 9

*Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977)....................... 23, 26

*Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986...................................................................... 31

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).................................................. 11

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984) ........................................................................... 7

*Milner v. Dep't of Navy*, ___ U.S. ___, 131 S. Ct. 1259 (2011)................................................... 6

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ..................................................................... 7, 30

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)........................................ 6

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................... 6

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ........................... 18, 22

*North v. Walsh*, 881 F.2d 1088 (D.C. Cir. 1989)........................................................................ 29

*Oglesby v. Dep't of Army*, 79 F.3d (D.C. Cir. 1996) .................................................................... 7

*Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)....................................................................... 11

*Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982)........................................................................ 28

*Pub. Citizen, Inc. v. OMB*, 598 F.3d 865 (D.C. Cir. 2010)......................................................... 18

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) ..................................... 6

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) ........................................................................ 7, 31

*Roth v. Dep't of Justice*, 642 F.3d 1161 (D.C. Cir. 2011) ............................................................. 9

*Rural Hous. Alliance v. Dep't of Agric.*, 498 F.2d 73 (D.C. Cir. 1974) ................................. 27, 28

*Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980), *overruled on other grounds by Klamath*, 532 U.S. 1 ........................................................................................................ 25

*Spirko v. U.S. Postal Serv.*, 147 F.3d 992 (D.C. Cir. 1998) ................................................. 30, 31

*Stern v . FBI*, 737 F.2d 84 (D.C. Cir. 1984) ......................................................................... 27, 28

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ......................................................................... 8

*Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir.1980) ........................................................................ 30

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ................................................................................. 6

**Statutes**

5 U.S.C. § 552 .............................................................................................................. passim

50 U.S.C. § 401 ................................................................................................................... 20

50 U.S.C. § 403–1 ............................................................................................................... 11

50 U.S.C. § 403-4 ............................................................................................................... 27

50 U.S.C. § 403-4a ...................................................................................................... 15, 27

50 U.S.C. § 403g ................................................................................................................ 11

50 U.S.C. § 403q ......................................................................................................... 1, 20, 24

50 U.S.C. § 431 ................................................................................................................... 20

**Other Authorities**

Adam Goldman & Matt Apuzzo, *Torture, Botched Rendition Investigations Dog CIA*, Associated Press, June 14, 2011 ........................................................................... 12

Eric H. Holder, U.S. Att'y Gen., Address Regarding a Preliminary Review into the Interrogation of Certain Detainees (Aug. 24, 2009) ........................................................... 2

Eric Lichtblau & Eric Schmitt, *U.S. Widens Inquiries into Two Jail Deaths*, N.Y. Times, June 30, 2011 ................................................................................................ 12

Exec. Order No. 13,491, 74 Fed. Reg. 4893 (Jan. 22, 2009) ........................................ 16

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ......................................................... 10

Fed. R. Civ. P. 56 ...................................................................................................................... 29

*Haunted by Homicide: Federal Grand Jury Investigates War Crimes and Torture in
    Death of 'the Iceman' at Abu Ghraib, Plus Other Alleged CIA Abuses*, Time
    Battleland Blog (June 13, 2011) ........................................................................................... 12

Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda Operative*
    (Aug. 1, 2002) ..................................................................................................................... 16

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C.
    §§ 2340–2340A to Certain Techniques That May Be Used in the Interrogation of a
    High Value al Qaeda Detainee* (May 10, 2005) ...................................................................... 16

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C.
    §§ 2340–2340A to the Combined Use of Certain Techniques in the Interrogation of
    High Value al Qaeda Detainees* (May 10, 2005) .................................................................... 15

Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of United
    States Obligations Under Article 16 of the Convention Against Torture to Certain
    Techniques That May Be Used in the Interrogation of High Value al Qaeda Detainees*
    (May 30, 2005) .................................................................................................................... 15

**INTRODUCTION**

This lawsuit concerns the withholding by the Central Intelligence Agency (CIA) of reports of internal investigations into the gross maltreatment of prisoners—maltreatment that, in at least two cases, resulted in prisoners' deaths.  Importantly, the suit does not concern information about interrogation methods—legal or not—that CIA personnel were authorized to use.  Rather, it seeks information about activities that no one contends, or could reasonably contend, were authorized.

In the days after September 11, 2001, the CIA established a program to detain and interrogate suspected terrorists abroad.  *See* SOMF ¶ 1; *see also* Decl. of Mitra Ebadolahi ("Ebadolahi Decl."), Ex. A (Cent. Intelligence Agency, Inspector Gen., Special Review: Counterterrorism Detention and Interrogation Activities (September 2001 – October 2003) (May 7, 2004), *available at* http://bit.ly/hEvzu8) [hereinafter *Special Review*].  In early 2003, the CIA's Office of the Inspector General (OIG) received information that some CIA employees "were concerned that certain covert Agency activities at an overseas detention and interrogation site might involve violations of human rights."  *Id*. at 2; *see also* SOMF ¶ 2.  At about the same time, the CIA's Deputy Director of Operations notified the OIG that he had "received allegations that Agency personnel had used unauthorized interrogation techniques" on a specific detainee, and he asked the OIG to investigate.  SOMF ¶ 3; Ebadolahi Decl. Ex. A (*Special Review*) at 1. The OIG, which is tasked with "conduct[ing] independent[] inspections, investigations, and audits relating to programs and operations of the Agency" in order to "detect fraud and abuse in such programs and operations," 50 U.S.C. § 403q(a)(1), (c), initiated an investigation.  SOMF ¶ 4; Ebadolahi Decl. Ex. A (*Special Review*) at 1.

In May 2004, the OIG completed a lengthy report—the *Special Review*—detailing its findings and setting forth a series of recommendations.  SOMF ¶4.  The report discussed the CIA's use of "specific unauthorized and undocumented techniques," including manipulation of pressure points, mock executions, use of smoke, use of cold, water dousing, "hard takedowns," and other abuses.  Ebadolahi Decl. Ex. A (*Special Review*) at 41–45, 69–78; *see also* SOMF ¶ 5. The report also recorded the use of an unloaded handgun and a power drill to threaten a detainee. SOMF ¶ 5; Ebadolahi Decl. Ex. A (*Special Review*) at 41–42.  Throughout the document, the OIG chronicled incidents "that involved the use of interrogation techniques that [the Department of Justice] and Headquarters *had not approved*."  *Id.* at 69 (emphasis added); *see also* SOMF ¶ 5. The report also indicated that further investigations had been opened into specific instances of abuse, including instances in which detainees had died in CIA custody as a result of their treatment.  SOMF ¶ 6.

In August 2009, in connection with a separate Freedom of Information Act (FOIA) lawsuit, the government released a partially redacted version of the OIG's *Special Review*.[1] SOMF ¶ 4.  The unredacted portions of this document provide a detailed description of the CIA's counterterrorism detention and interrogation activities.  Particularly relevant here, they make clear that individuals working for or with the CIA engaged in conduct that neither the agency nor the OIG regarded as authorized.  When the report was released, Attorney General Eric Holder announced that he had asked a federal prosecutor to consider the appropriateness of criminal charges.  *See* Eric H. Holder, U.S. Att'y Gen., Address Regarding a Preliminary Review into the Interrogation of Certain Detainees (Aug. 24, 2009), http://1.usa.gov/zoGbmH.

---

[1] *See ACLU v. Dep't of Def.*, No. 1:04-cv-04151 (S.D.N.Y.).

In April 2011, the American Civil Liberties Union and American Civil Liberties Foundation (collectively, ACLU or Plaintiffs) filed a FOIA request—the one at issue here—for all CIA OIG reports "relating to the detention, interrogation, or treatment of individuals apprehended after September 11, 2001, and held at detention facilities outside the United States." *See* Decl. of Martha M. Lutz, Information Review Officer, Director's Area, Central Intelligence Agency (Jan. 10, 2012), ECF No. 16-3 [hereinafter "Lutz Decl."], Ex. A (FOIA Request) at 1; SOMF ¶ 8.

In response, the CIA acknowledged the existence of eleven reports (in addition to the *Special Review*), including at least two reports documenting the circumstances surrounding the deaths of two detainees while in Agency custody. *See* SOMF ¶ 9; Lutz Decl. Ex. E (final *Vaughn* Index). The CIA withheld the reports in full, however, on the basis of Exemptions 1, 3, 5, and 7. SOMF ¶ 9.

The CIA has not carried its burden of demonstrating that these exemptions apply. First, its argument that the records are withholdable under Exemptions 1 and 3 as "intelligence sources and methods" misunderstands both the scope of Plaintiffs' request and the nature of the requested records. Again, Plaintiffs do not now challenge the CIA's withholding of information concerning the use of interrogation methods (lawful or not) that were authorized. Rather, Plaintiffs seek information concerning activities that both the CIA and the OIG regarded as *ultra vires*. There is no serious dispute that some of the withheld information concerns such activities. Indeed, it was the CIA's own suspicion that some personnel had engaged in unauthorized activity, along with reports of such unauthorized activities from other personnel, that led the OIG to launch its investigation. The CIA's authority to protect "intelligence sources and methods" is broad, but it does not extend to activity that even the CIA does not (and could not possibly)

contend was authorized.  Indeed, the Supreme Court has made clear that "intelligence sources and methods" do not include information beyond the scope of the CIA's mandate.  *See CIA v. Sims*, 471 U.S. 159, 169 (1985).

Nor do Exemptions 5 and 7 provide a basis for withholding the records at issue here.  The CIA has not shown that the OIG reports are deliberative or predecisional, and accordingly its invocation of Exemption 5 is unavailing.  Because the Agency has not shown that the records were compiled for law enforcement purposes, or that their release would interfere with enforcement proceedings, the CIA's invocation of Exemption 7 is unavailing, too.

Because the Agency has no valid basis for withholding the OIG reports, the Court should deny the Agency's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment.  The Court should order the CIA to release the portions of the OIG reports describing the use of unauthorized techniques immediately.  In the alternative and at a minimum, the Court should order the CIA to submit the withheld documents for *in camera* review, and ensure that all segregable portions of the records are released.

## PROCEDURAL HISTORY

As noted, the ACLU filed a FOIA request in April 2011, seeking the release of all CIA OIG reports "relating to the detention, interrogation, or treatment of individuals apprehended after September 11, 2001, and held at detention facilities outside the United States."  Lutz Decl. Ex. A (FOIA Request) at 1; SOMF ¶ 8.[2]  After the CIA denied the ACLU's request for expedited processing, *see* Lutz Decl. Ex. B (letter dated May 5, 2011), the ACLU filed the instant action challenging both the denial and the Agency's failure to produce the requested information.  *See*

_____

[2] The request additionally sought release of "all reports or conclusions of an internal inquiry or investigation into the CIA's Inspector General or Office of the Inspector General."  Lutz Decl. Ex. A (FOIA Request) at 1.  This aspect of the FOIA request is no longer at issue in this litigation.

4

Compl. for Injunctive Relief (May 18, 2011), ECF No. 1.  The ACLU subsequently filed an amended complaint, *see* First Am. Compl. for Injunctive Relief (June 16, 2011), ECF No. 8, which the CIA answered.  *See* Answer (July 5, 2011), ECF No. 9.  The following month, the CIA notified the Court that it would process the ACLU's FOIA request by September 30, 2011.  *See* Def.'s Status Report (Aug. 4, 2011), ECF No. 12, ¶ 3.

On that date, the CIA acknowledged the existence of eleven CIA OIG reports responsive to the ACLU's FOIA request ("Documents 1–11"), but declared that all of these reports were being withheld in full pursuant to various FOIA exemptions.[3]  *See* SOMF ¶ 9; Lutz Decl. Ex. C (Letter from the CIA to the ACLU dated Sept. 30, 2011).

Plaintiffs asked the CIA to prepare a draft *Vaughn* Index describing the information withheld and identifying the specific exemptions invoked for each OIG report.  *See* SOMF ¶ 10; Ebadolahi Decl. Ex. B (Joint Status Report (Oct. 11, 2011), ECF No. 13).  The CIA agreed to do so.  SOMF ¶ 10.  Upon receipt of the draft *Vaughn* Index, Plaintiffs clarified that they were not seeking "the identities of CIA operatives; the specific questions asked of detainees by interrogators; the responses given by detainees to those questions; [or] the identities of foreign governments or agents."  *See* SOMF ¶ 11; Ebadolahi Decl. Ex. C (Letter from the ACLU to the CIA dated Nov. 29, 2011).  Plaintiffs had hoped to further narrow the issues in dispute, but the draft *Vaughn* Index was so devoid of descriptive information that this was impossible.  *See* Ebadolahi Decl. Ex. D (Letter from the CIA to the ACLU dated Nov. 14, 2011 (First *Vaughn* Index)).

---

[3] A twelfth report—Special Review, *Counterterrorism Detention and Interrogation Activities (September 2001 – October 2003)*—was located as well.  Since that report had been released previously as part of a separate FOIA action, *see supra* note 1, it is not at issue in this litigation.

The CIA asserts that it is entitled to judgment as a matter of law on the application of various FOIA exemptions to the withheld information.  *See* Def.'s Mem. in Supp. Mot. for Summ. J. (Jan. 10, 2012), ECF No. 16 [hereinafter "CIA Br."]; *see also* Lutz Decl.; *id.* Ex. E (final *Vaughn* Index).  The ACLU opposes the Agency's motion, and submits this cross-motion for summary judgment.  At issue is solely the question of whether the CIA may withhold descriptions in the OIG reports of the use of unauthorized interrogation methods.

## APPLICABLE LEGAL STANDARDS

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA is designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

The FOIA exemptions pursuant to which an agency may withhold information, 5 U.S.C. § 552(b)(1)–(9), are "'limited exemptions [that] do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'"  *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (internal quotation marks omitted)).  The exemptions are exclusive and narrowly construed, *see Milner v. Dep't of Navy*, ___ U.S. ___, 131 S. Ct. 1259, 1262 (2011); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7–8 (2001), and the government bears the burden of proving that any exemption applies, *see Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).  These limitations on FOIA exemptions apply in all FOIA cases, including those involving national security.  *See, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (stating, in a case involving national security

6

concerns, that "FOIA exemptions are to be narrowly construed," and that "the burden is on the agency to sustain its action" (citation omitted)); *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (same); *cf. Ray v. Turner*, 587 F.2d 1187, 1193–94 (D.C. Cir. 1978) (discussing how Congress rejected a proposed amendment to the FOIA that would have imposed a more deferential standard of review of agency decisions to withhold documents in the national security context, and explaining that Congress "stressed the need for an objective, independent judicial determination, and insisted that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security").

To further promote disclosure, FOIA also requires a defendant agency to disclose any "reasonably segregable portion of a record."  5 U.S.C. § 552(b).  The government must explain the process by which it has reviewed withheld material for segregable portions; it is insufficient simply to claim that such a review has been completed.  *See, e.g.*, *Oglesby v. Dep't of Army*, 79 F.3d 1172, 1180 (D.C. Cir. 1996) (holding Army's claim that a withheld file was not segregable legally inadequate where the accompanying declaration "provides no details justifying that conclusion"); *accord Judicial Watch, Inc. v. Dep't of Homeland Sec.*, ___ F. Supp. 2d ____, No. 11-00604 (CKK), 2012 WL 251914, at *12 (D.D.C. Jan. 27, 2012) (rejecting agency's "empty invocation of the segregability standard").

When an agency has withheld documents pursuant to one or more FOIA exemptions, it must provide affidavits that "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  To meet its burden of proving that an exemption

applies, the government may submit an index alongside its declaration.  *See Vaughn v. Rosen*,
484 F.2d 820, 826–28 (D.C. Cir. 1973).  The purpose of this so-called *Vaughn* Index is to enable
"the court to rule without full disclosure of the documents themselves," *Landmark Legal Found.*
*v. IRS*, 267 F.3d 1132, 1138 (D.C. Cir. 2001); accordingly, for a *Vaughn* Index to be adequate,
"each [withheld] document must be broken down into manageable segments that are cross-
referenced to the relevant claim, defense, or privilege," *Dellums v. Powell*, 642 F.2d 1351, 1360
(D.C. Cir. 1980).  Although this process "is undoubtedly painstaking and time-consuming" for
the government, "it must be done if a District Court is to analyze claims that apply" to any
voluminous set of records *de novo*, as FOIA requires.  *Id.*; *see also* 5 U.S.C. § 552(a)(4)(B).

   Given that the court's review of an agency's exemption claims is *de novo*, "conclusory
affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . .
carry the government's burden."  *Larson*, 565 F.3d at 864; *see also King v. Dep't of Justice*, 830
F.2d 210, 219 (D.C. Cir. 1987) ("To accept an inadequately supported exemption claim 'would
constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo*
review.'" (quoting *Allen v. CIA*, 636 F.2d 1287, 1293 (D.C. Cir. 1980), *abrogated on other*
*grounds by Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983))).  Where
the agency has failed to justify its withholdings, a FOIA plaintiff is entitled to summary
judgment under Federal Rule of Civil Procedure 56.  *See, e.g.*, *Coastal States Gas Corp. v. Dep't*
*of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) (affirming the district court's order that the
agency release certain documents because the agency had failed to carry its burden of justifying
withholding the documents).

   "Requiring agencies to provide *public* explanations for their redactions" is an important
part of FOIA litigation, as it "allows for adversarial testing of the agencies' claims, . . .

focus[ing] the court's attention on the most important issues in the litigation and . . . reveal[ing] not otherwise apparent flaws in the agencies' reasoning." *Roth v. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011) (emphasis added).  There may be "occasions when extensive public justification would threaten to reveal the very information for which a FOIA exemption is claimed," but "an agency is still required to provide as much public explanation as it can without giving away the information it is trying to withhold."  *Id.* (internal quotation marks and citations omitted).  *In camera* review may serve as a "supplement" to the agency's public explanation, *id.* (citation omitted), but it is "no 'substitute for the government's obligation to provide detailed public indexes and justifications whenever possible.'"  *Id.* (quoting *Lykins v. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984)); *see also* 5 U.S.C. § 552(a)(4)(B) (a district court "may examine the contents of [withheld] agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of [FOIA] exemptions . . . and the burden is on the agency to sustain its action").

## ARGUMENT

The only question in this FOIA suit is whether the CIA may lawfully withhold information relating to activities that the CIA and the OIG regarded as beyond the Agency's mandate.  It may not.  Accordingly, the ACLU—and not the Agency—is entitled to summary judgment.  Alternatively, and at a minimum, this Court should conduct an *in camera* review of the withheld documents and ensure that all segregable portions of each are promptly disclosed.

**I.     The CIA Cannot Rely on Exemption 1 or Exemption 3 to Withhold Descriptions of Unauthorized Techniques.**

The CIA relies on Exemptions 1 and 3 to withhold all eleven OIG reports in full.  These reports, however, relate at least in part to activities that even the CIA does not contend were authorized.  For example, two of the reports relate to the deaths of detainees in U.S. custody.  *See*

9

Vaughn Index Docs. 2 & 8.  Another report details the use of unauthorized interrogation techniques, including the use of a handgun and a power drill to threaten a detainee.  The CIA cannot rely on Exemptions 1 and 3 to protect this information.  As the Supreme Court has made clear, *see CIA v. Sims*, 471 U.S. 159, 169 (1985), activity that was indisputably unauthorized— i.e., activity that was beyond the agency's mandate, as even the agency itself conceived of that mandate—is not an "intelligence activity" or an "intelligence source or method" protectable under Exemption 1 or 3.

Exemption 1 permits the withholding of matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The applicable Executive Order establishes that "[i]nformation shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security."  Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707, 707 (Dec. 29, 2009).  The Executive Order further states that information may be classified only if the following requirements are met: (1) the information must be classified by an "original classification authority"; (2) the information must be "owned by, produced by or for, or . . . under the control of the United States Government"; (3) the information must fall within one of the withholding categories authorized under the Executive Order; and (4) the original classification authority must determine "that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," and must be "able to identify or describe the damage."  *Id.* § 1.1(a)(1)–(4); *see id.* § 1.4 (listing authorized withholding categories).  For the reasons explained below, the CIA has not satisfied the third and fourth of these requirements.

Under Exemption 3, an agency need not "disclose matters that are . . . specifically exempted from disclosure by statute . . . provided that such statute refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). To withhold information under Exemption 3, the CIA invokes two statutes. The first, section 102A(i)(1) of the National Security Act of 1947, provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1); *see also* Lutz Decl. ¶ 41. The second, section 6 of the Central Intelligence Act of 1949 ("CIA Act"), states that the DNI "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure" and exempts the CIA from any law that would otherwise "require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g; *see also* Lutz Decl. ¶ 42. Since the OIG reports describe unauthorized activities that do not qualify as protectable "intelligence sources and methods," the CIA may not withhold the reports under Exemption 3, as explained below.[4]

### A.   The OIG Reports Describe Unauthorized Activities That Fall Outside the CIA's Mandate and Thus Cannot Be Withheld Under Exemptions 1 or 3.

The CIA may not withhold as "intelligence activities," "sources," or "methods," descriptions of conduct not even the CIA believes to be within its mandate.

Though there is no statutory definition of the term "intelligence source or method," the Supreme Court has delineated the term's outer bounds. In *CIA v. Sims*, 471 U.S. 159 (1985), the

---

[4] It is well settled that the phrase "intelligence sources and methods" is accorded the same meaning under Exemptions 1 and 3. *See, e.g.*, *Military Audit Project v. Casey*, 656 F.2d 724, 736–37 n.39 (D.C. Cir. 1981) (holding Exemption 3 provides overlapping protection with Exemption 1 where disclosure of classified information would reveal intelligence sources and methods); *Phillippi v. CIA*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976) (noting that "inquiries into the applicability of the two Exemptions may tend to merge" in cases where information is classified to prevent disclosure of intelligence sources and methods).

Court made clear that the term "intelligence sources and methods" encompasses only activities that are within the CIA's mandate.  At issue in *Sims* was the CIA's withholding of the names of individuals and institutions the Agency had consulted as part of a clandestine research and development project.  471 U.S. at 161–63.  The plaintiffs contended that the CIA should not be permitted to withhold the names as "intelligence sources and methods" unless it could demonstrate that it needed to do so in order to obtain intelligence.  *Id.* at 168.  The Court rejected that argument.  In doing so, however, it noted that "intelligence sources and methods" reaches only sources and methods that "fall within the Agency's mandate."  *Id.* at 169.

Thus, the Supreme Court's definition of "intelligence sources and methods" is broad but not unlimited.  The eleven OIG reports at issue here plainly contain information relating to activities that were not within the CIA's mandate, and accordingly they contain information that cannot lawfully be withheld.

The facts confirm that not even the CIA considers the activities described in the OIG reports to be—or to have been—within its mandate.  Indeed, the CIA itself referred some of the conduct described in the reports to the Department of Justice for criminal investigation.  *See, e.g.*, Adam Goldman & Matt Apuzzo, *Torture, Botched Rendition Investigations Dog CIA*, Associated Press, June 14, 2011, http://abcn.ws/y1Owaj.  A closer look at several of the withheld reports supports this conclusion.

The second OIG report pertains to the OIG's "Investigation of the Death of 'Abid Hamad Mahawish Al-Mahalawi," *Vaughn* Index Doc. 2, and the eighth report concerns the OIG's "Investigation of the Death of Manadal Al-Jamaidi," *Vaughn* Index Doc. 8.  Thus, each of these OIG reports relates to the deaths of specific detainees while in CIA custody—incidents so troubling that the CIA itself referred them for criminal investigation and that the DOJ is, in fact,

investigating.  *See, e.g.*, Eric Lichtblau & Eric Schmitt, *U.S. Widens Inquiries into Two Jail Deaths*, N.Y. Times, June 30, 2011, http://nyti.ms/xY9IRS; Adam Zagorin, *Haunted by Homicide: Federal Grand Jury Investigates War Crimes and Torture in Death of 'the Iceman' at Abu Ghraib, Plus Other Alleged CIA Abuses*, Time Battleland Blog (June 13, 2011), http://ti.me/xuZw4b.  Whatever actions the CIA may have authorized with respect to detainees in Agency custody after September 11, it surely did not consider the activities that brought about the deaths of detainees to have been within the Agency's mandate.

The third report, "Investigation of Interrogation Techniques at Detention Facility," also relates to activities that far exceeded the Agency's mandate.  According to the Inspector General's May 2004 *Special Review*, the OIG investigated the use of "specific unauthorized or undocumented techniques" and released a report documenting incidents involving such techniques on October 29, 2003.  *See* Ebadolahi Decl. Ex. A (*Special Review*) at 41–42 & n.46. The "most significant" unauthorized techniques involved the use of an unloaded handgun and a power drill to threaten a detainee during an interrogation.  *See id.* at 42.  The *Special Review* indicates that "[s]ometime between 28 December 2002 and 1 January 2003, the debriefer [a senior operations officer] used an unloaded semi-automatic handgun as a prop to frighten Al-Nashiri into disclosing information," and further that "probably the same day, the debriefer used a power drill to frighten Al-Nashiri."  *Id.* at 41–42.  This occurred when "the debriefer entered the detainee's cell and revved the drill while the detainee stood naked and hooded."  *Id.*  The *Special Review* makes clear that the debriefer and his colleague "did not request authorization or report the use of these unauthorized techniques to Headquarters."  *Id.*  The full report on the CIA's use of these unauthorized techniques is Document 3.  *Id.*; *see also Vaughn* Index Doc. 3.

13

Such indisputably unauthorized conduct, far exceeding the scope of the CIA's statutory mandate, does not qualify as protectable "intelligence activities" or "intelligence sources or methods."  Although fewer details are known about the other withheld reports, the titles of these reports suggest that they, too, include discussions of unauthorized activities.[5]  Such unauthorized techniques cannot be properly classified as "intelligence activities" or "intelligence sources and methods" under the Supreme Court's reasoning in *Sims*.  The OIG's reports documenting instances of unauthorized activities, therefore, may not be withheld by the CIA under either Exemption 1 or 3.

*ACLU v. Department of Defense*, 628 F.3d 612 (D.C. Cir. 2011), does not compel a contrary conclusion.  There, the D.C. Circuit concluded "that the President's prohibition of the future use of certain interrogation techniques and conditions of confinement does not diminish the government's otherwise valid authority to classify information about those techniques and conditions and to withhold it from disclosure under exemptions 1 and 3."  *Id.* at 622.  In other words, *Department of Defense* considered whether the government could withhold information about interrogation techniques alleged to be unlawful.  It did *not* consider, however, the distinct question presented here: whether the CIA can classify descriptions of activities that are unquestionably *outside its mandate*, and that the Agency considered to be outside its mandate at the time the conduct took place.  The answer to that question is certainly "no."

Moreover, the practical distinction between *Department of Defense* and this case is clear.  There, the D.C. Circuit rejected an invitation to determine for itself whether certain interrogation

---

[5] For example, Document 1 is an "Investigation of Alleged Mistreatment of a Detainee," *Vaughn* Index Doc. 1; Document 5 is an "Investigation of Abuse of Detainees," *Vaughn* Index Doc. 5; and Document 6 is an "Investigation of the Nonregistration of Detainees," *Vaughn* Index Doc. 6.

techniques were illegal.  Here, no such determination is necessary, because not even the CIA

contends that the conduct described in the OIG reports was within its mandate.

In order to classify and withhold information as an "intelligence source or method" or

"intelligence activity," the CIA must first ensure that the information comes within its mandate.

*Sims*, 471 U.S. at 167; *see also* 50 U.S.C. § 403-4a(d)(1) (restricting the CIA's intelligence

gathering to "appropriate" means).  Where, as here, this threshold condition has not been

satisfied, the Agency may not invoke Exemptions 1 and 3 to withhold information responsive to

a FOIA request.  Accordingly, the portions of the OIG reports that describe unauthorized conduct

must be released.

### B.  Release of Descriptions of Unauthorized Techniques Will Not Endanger National Security.

The CIA's Exemption 1 argument must also fail for an independent reason: the Agency

cannot show that disclosing details about unauthorized techniques will cause any harm to

national security.  The CIA's primary contention is that release of the reports would degrade the

effectiveness of its interrogation techniques in the future.  Lutz Decl. ¶¶ 30, 34–35.  But the CIA

overlooks the pivotal, undisputed fact at the heart of this case: as the OIG's *Special Review* and

the Agency's own *Vaughn* Index make clear, the withheld reports describe *unauthorized*

techniques and activities.  As discussed above, the CIA itself has acknowledged such

"unauthorized" behavior.  *See* Ebadolahi Decl. Ex. A (*Special Review*) at 41–42 & n.46.  No

harm can come from releasing details about incidents and techniques that the CIA admits were

unauthorized.

Moreover, the CIA's claims that "unauthorized disclosure of the details of the former

program . . . reasonably could be expected to result in exceptionally grave damage to the national

security," Lutz Decl. ¶ 34, or that such details "would allow terrorist organizations to more

15

effectively train to resist such techniques," *id.* ¶ 35, make no sense in light of the historical record.  The procedures and methods to which the CIA alludes have been described in concrete, meticulous, and startling detail in four legal memoranda already released by the DOJ.[6]  These procedures and methods have also been banned.  *See generally* Exec. Order No. 13,491, 74 Fed. Reg. 4893 (Jan. 22, 2009).  No harm will result from releasing information about techniques that have already been disclosed in significant detail.

More importantly—and as repeatedly emphasized throughout this brief—this litigation pertains to descriptions of activities that *exceeded* the "enhanced interrogation techniques" and the legal authority supplied in the OLC memoranda.  *Compare* Ebadolahi Decl. Ex. A (*Special Review*) at 30 ("EITs include physical actions and are defined as 'techniques that do incorporate physical or psychological pressure beyond Standard Techniques.'  Headquarters must approve the use of each specific EIT in advance.") *with id.* at 41 (noting that the OIG "heard allegations of the use of unauthorized techniques . . . and other techniques that caused concern because DOJ had not specifically approved them").  It is no defense to disclosure of those descriptions that *other* interrogation techniques must be protected.  Rather, the CIA must argue that releasing descriptions of *unauthorized* techniques would somehow compromise its mission.  Not surprisingly, the Agency has not made this unsound argument.

---

[6] *See* Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of United States Obligations Under Article 16 of the Convention Against Torture to Certain Techniques That May Be Used in the Interrogation of High Value al Qaeda Detainees* (May 30, 2005), *available at* http://www.justice.gov/olc/docs/memo-bradbury2005.pdf; Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to the Combined Use of Certain Techniques in the Interrogation of High Value al Qaeda Detainees* (May 10, 2005), *available at* http://www.justice.gov/olc/docs/memo-bradbury2005-2.pdf; Memorandum from Steven G. Bradbury to John A. Rizzo, *Re: Application of 18 U.S.C. §§ 2340–2340A to Certain Techniques That May Be Used in the Interrogation of a High Value al Qaeda Detainee* (May 10, 2005), *available at* http://www.justice.gov/olc/docs/memo-bradbury2005-3.pdf; Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda Operative* (Aug. 1, 2002), *available at* http://www.justice.gov/olc/docs/memo-bybee2002.pdf.

Finally, the CIA contends that releasing the OIG reports would reveal the "specific assistance" provided by foreign governments, damaging the Agency's relationships with those governments. Lutz Decl. ¶ 39. This concern, however, can be addressed by redaction of country names; as the ACLU made clear in its November 2011 letter to the CIA, it does not seek "the identities of foreign governments or agents" in this FOIA request. *See* Ebadolahi Decl. Ex. C.

\*\*\*

To summarize: Through this FOIA, the ACLU does not seek information about the CIA's *lawful* intelligence activities, sources, or methods. The ACLU also does not seek information about *unlawful* activities, sources, or methods that were authorized initially, such as the "enhanced interrogation techniques." Rather, Plaintiffs have requested records relating to *unauthorized* activities, sources, and methods—which not even the CIA defends as within the scope of its intelligence mandate. As explained, the Agency *cannot* classify this information as intelligence sources, methods, or activities because the information describes only conduct beyond the Agency's statutory mandate.

## II.   The CIA Has Failed to Establish that Exemption 5 Applies to the Withheld Reports.

The CIA next argues that portions of the OIG reports fall within Exemption 5— specifically, that these segments are protected under the deliberative process privilege. *See* Lutz Decl. ¶ 46. The Agency, however, has failed to establish either precondition for the application of the deliberative process privilege: it has shown neither that the withheld reports are predecisional, nor that they were deliberative. Exemption 5 therefore does not apply to the contested documents.

Exemption 5 protects "inter-agency or intra-agency memorandum or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C.

§ 552(b)(5).  In other words, Exemption 5 "allows agencies to withhold documents that would be

protected from disclosure in litigation under one of the recognized evidentiary or discovery

privileges," *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010), including the

deliberative process privilege.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862

(D.C. Cir. 1980) (citations omitted).  "Under the federal common law, the proponent bears the

burden of demonstrating the applicability of any asserted privilege with 'reasonable certainty.'"

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*, No. 11-00604 (CKK), 2012 WL 251914, at *5

(D.D.C. Jan. 27, 2012) (citing *In re Subpoena Duces Tecum Issued to Commodity Futures*

*Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) and *Fed. Trade Comm'n v. TRW, Inc.*, 628

F.2d 207, 213 (D.C. Cir. 1980)).  To carry this burden, "the proponent must adduce competent

evidence in support of each of the essential elements necessary to support a claim of privilege."

*Id.* (quoting *Alexander v. FBI*, 192 F.R.D. 42, 45 (D.D.C. 2000) (internal quotation marks

omitted)).

     The "ultimate purpose" of the deliberative process privilege "is to prevent injury to the

quality of agency decisions."  *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132,

151 (1975).  More particularly, the privilege:

> serves to assure that subordinates within an agency will feel free to provide the
> decisionmaker with their uninhibited opinions and recommendations without fear
> of later being subject to public ridicule or criticism; to protect against premature
> disclosure of proposed policies before they have been finally formulated or
> adopted; and to protect against confusing the issues and misleading the public by
> dissemination of documents suggesting reasons and rationales for a course of
> action which were not in fact the ultimate reasons for the agency's action.

*Pub. Citizen*, 598 F.3d at 874 (quoting *Coastal States Gas Corp.*, 617 F.2d at 866).  Accordingly,

two prerequisites must be satisfied for the privilege to apply.  First, a document must be

predecisional, that is, "generated before the adoption of agency policy."  *Coastal States Gas*

*Corp.*, 617 F.2d at 866.  Second, a document must be deliberative, meaning it must "reflect[] the give-and-take of the consultative process."  *Id.*; *see also, e.g.*, *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).

### A.   *The Documents Withheld Are Not Predecisional.*

"[T]o approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed,'" *Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (citation omitted), or at the very least identify a decisionmaking *process* to which the document contributed.  *See Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991).  Notwithstanding this clear requirement, the CIA nowhere identifies any specific decision or decisionmaking process relevant to the withheld documents.  Consequently, the Agency has failed to establish that any of the withheld documents are predecisional, as is necessary for a successful Exemption 5 claim.  *See, e.g.*, *Judiciary Comm.*, 823 F.2d at 585 ("We search in vain through the supporting material submitted by the DOJ for any identification of the specific final decisions to which the advice or recommendations contained in the withheld documents contributed; absent that, we are not positioned to pass upon the applicability *vel non* of this privilege.").

Information Review Officer ("IRO") Lutz avers that Documents 1–11 are subject to the deliberative process privilege because they are "reports that contain findings, conclusions and recommendations that reflect the pre-decisional deliberations of CIA officials."  Lutz Decl. ¶ 46.  She asserts that the OIG "is an investigative body of the CIA" and that, as such, "its various findings, recommendations and analyses are deliberative."  *Id.*  That is a *non sequitur*: not every investigation is for the purpose of making a decision.  Many investigations are for the purpose of finding out *what happened*.  While the OIG is empowered to "recommend policies designed to

promote economy, efficiency, and effectiveness in the administration" of CIA programs and operations, it is also tasked with "detect[ing] fraud and abuse in such programs and operations." 50 U.S.C. § 403q(a)(2).  Ms. Lutz's declaration is deficient to overcome the record evidence that at least some, if not all, of the withheld OIG reports were undertaken to detect fraud and abuse in past Agency programs, rather than to recommend forward-looking policies to improve Agency operations.

Following Ms. Lutz's logic would create a categorical exemption from FOIA's disclosure requirements for OIG reports.  Congress has rejected such an exemption.  The CIA Information Act, 50 U.S.C. § 401 *et seq.*, authorizes the head of the CIA to exempt operational files from the purview of FOIA.  *See* 50 U.S.C. § 431(a).  Operational files, however, do not include OIG files.  Indeed, Congress expressly carved out an exception to this "operational file" exemption to make clear that FOIA *does* apply to information relating to OIG investigations of improper or illegal conduct.  *See id.* § 431(c)(3).  The CIA's effort to label all OIG "findings, recommendations, and analyses" as "deliberative" is an unavailing end-run around Congress's express command that OIG files be subject to FOIA.

More broadly, Ms. Lutz's assertions imply that the deliberative process privilege extends to *all* records produced by any government investigative body.  The CIA provides no legal authority for this sweeping proposition, as there is none.  The D.C. Circuit has previously recognized the deliberative process privilege cannot be stretched that far.  *See Coastal States Gas Corp.*, 617 F.2d at 868 ("Characterizing these documents as 'predecisional' simply because they play into an ongoing audit process would be a serious warping of the meaning of the word.  No 'decision' is being made or 'policy' being considered; rather the documents discuss established

policies and decisions the agency regulations in the light of a specific, and often hypothetical,

fact pattern.").

Other courts have reached the same conclusion when presented with comparable

arguments.  *See, e.g.*, *City of Virginia Beach v. Dep't of Commerce*, 995 F.2d 1247, 1255 (4th

Cir. 1993) ("Of course, while the government need not anchor documents to a single, discrete

decision amidst ongoing deliberative processes, an overly lax construction of the term

'predecisional' submerges the rule of disclosure under the exemption." (citations omitted));

*Assembly of State of Calif. v. Dep't of Commerce*, 968 F.2d 916, 921 (9th Cir. 1992) ("DOC

makes a further argument that the adjusted census tapes are predecisional because they may be

used in the future by the Census Bureau in calculating its intercensal population estimates.  This

argument proves far too much.  Any memorandum always will be 'predecisional' if referenced to

a decision that possibly may be made at some undisclosed time in the future.").  *See generally*

*Judiciary Comm.*, 823 F.2d at 584 ("Congress intended to confine exemption (b)(5) as narrowly

as is consistent with efficient Government operation." (internal quotation marks and citations

omitted)).

Even assuming that the withheld documents do relate to some decision or decisionmaking

process, the record suggests that the documents merely report the *consequences* of previous CIA

programs—and are not, therefore, predecisional.  The CIA's *Vaughn* Index states in a conclusory

fashion that the documents at issue "contain[] information relating to intra-agency predecisional

deliberations, including preliminary evaluations, opinions, and recommendations of CIA

officers."  *E.g.*, *Vaughn* Index Doc. 1; *see also, e.g.*, *Judiciary Comm.*, 823 F.2d at 585 ("where

no factual support is provided for an *essential* element of the claimed privilege or shield, the

label 'conclusory' is surely apt").  The record before the Court does not, however, demonstrate

that any of the withheld information actually *preceded* relevant CIA policymaking processes.[7]

But whether the deliberative process privilege was properly applied here turns in large part on

that essential question of chronological fact.  *See, e.g.*, *Sears*, 421 U.S. at 151 ("[I]t is difficult to

see how the quality of a decision will be affected by communications with respect to the decision

occurring after the decision is finally reached; and therefore equally difficult to see how the

quality of the decision will be affected by forced disclosure of such communications, as long as

prior communications and the ingredients of the decisionmaking process are not disclosed.").

Without establishing the timeline, the Agency is not entitled to summary judgment.  *Cf.*

*Judiciary Comm.*, 823 F.2d at 585 ("a document is 'predecisional' if it precedes, in temporal

sequence, the 'decision' to which it relates"); *see also, e.g.*, *Gutman v. Dep't of Justice*, 238 F.

Supp. 2d 284, 292–93 (D.D.C. 2003) (the communication "must be antecedent to the adoption of

an agency policy" (internal quotation marks and citation omitted)).

---

[7] To the contrary: there is evidence in the record that most, if not all, of the withheld CIA OIG
reports relate *back* in time.  For example, Document 1 (Mar. 31, 2004) pertains to an
"Investigation of Alleged Mistreatment of a Detainee," which presumably occurred after the
detainee was mistreated.  Documents 4 (July 16, 2007), 5 (Aug. 2, 2007), and 7 (Apr. 27, 2005)
likewise pertain to investigations of detainee treatment.  Documents 2 (July 20, 2006) and 8
(Nov. 3, 2005) each relate to investigations of deaths of specific detainees, which, again, could
only have occurred after the detainees died in custody.
    Document 3 (Oct. 29, 2003) concerns an "Investigation of Interrogation Techniques at
Detention Facility," which presumably reviewed techniques *already in place*.  Similarly,
Document 6 (Dec. 13, 2005) is an investigative report on detainee nonregistration.  The
description of this document indicates that it relates to "certain detainees"—thus, it is not an
abstract, predecisional policy paper, but instead a report on previous practices, as applied to
particular individuals.
    Document 9 (June 14, 2006) is a report on overseas CIA detention facilities; the CIA has
failed to identify to what policymaking process, if any, this report refers.  The same defect
applies to Documents 10 (June 26, 2002) and 11 (June 3, 2009), which are reports on the CIA's
counterterrorism operations.  Given the date of Document 11, in particular, it seems highly
unlikely that the report is predecisional in any way: the report was created six months *after*
President Obama ended the CIA's detention and interrogation program.  *See generally Vaughn*
Index.

In the alternative, Ms. Lutz explains that the information withheld from Documents 1–11 under the deliberative process privilege includes "suggested solutions to identified issues involved in the detention and interrogation of detainees; evaluations and conclusions on the laws governing registration of detainees; findings and conclusions on the circumstances surrounding treatment of certain detainees; and recommendations on the scope of CIA counterterrorism activities."  Lutz Decl. ¶ 46.  Yet "findings and conclusions on circumstances surrounding treatment of certain detainees" describe purely factual information assembled long after any CIA policy determinations had been completed.  Ms. Lutz's generalized statements, repeated for each withheld OIG report, do not differentiate between such factual "findings" and any "recommendations," and thus do not provide the Plaintiffs or the Court with sufficient detail to ascertain whether Exemption 5 is correctly invoked for all or part of any specific document.  *See, e.g.*, *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) ("[W]e require that when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." (citations omitted)).

### B.  The Documents Withheld Are Not Deliberative.

Just as the Agency has failed to carry its burden of showing that the withheld documents were predecisional, it has also failed to establish that they are "deliberative."  The D.C. Circuit has explained that "the word 'deliberative' as used in the law of Exemption 5 is considerably narrower than the colloquial meaning."  *Access Reports*, 926 F.2d at 1195.  The deliberative process privilege is designed to protect "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer

rather than the policy of the agency," that is, those documents "which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Coastal States Gas Corp.*, 617 F.2d at 866. Clues that a document is deliberative and thus exempt include indications that the document "is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency," or that it "is recommendatory in nature or is a draft of what will become a final document," or that it "weigh[s] the pros and cons of agency adoption of one viewpoint or another." *Id.*

The CIA's submissions are inadequate to support a conclusion that the withheld documents are "deliberative" under these standards. There is no indication that the OIG reports are drafts, proposals, or documents that reflect the personal opinions of their authors. Although the reports may contain recommendations, these can be segregated from the rest of the reports, which must be released.

Two additional factors that can assist the court in determining whether information is "deliberative" within the meaning of the privilege are "the nature of the decisionmaking authority vested in the officer or person issuing the disputed document" and "the relative positions in the agency's 'chain of command' occupied by the document's author and recipient." *Judicial Comm.*, 823 F.2d at 586 (internal quotation marks and citations omitted). Applying these parameters to this case further undermines the CIA's assertions that the OIG reports are "deliberative" in any way. The Inspector General is not a part of the same "chain of command" or hierarchy as CIA leadership or Agency decisionmakers; rather, he or she is an independent overseer of Agency activities. *See* 50 U.S.C. § 403q(a)(1), (b)(1), (c)(1). The record evidence suggests that the OIG reports were independent evaluations of past Agency programs,

24

undertaken out of concerns that individuals working for or with the CIA had engaged in unauthorized conduct. *See, e.g.*, Ebadolahi Decl. Ex. A (*Special Review*) at 1–2 ("In January 2003, the [Deputy Director for Operations] informed OIG that he had received allegations that Agency personnel had used unauthorized interrogation techniques with a detainee, 'Abd Al-Rahim Al-Nashiri, at another foreign site, and requested that OIG investigate. Separately, OIG received information that some employees were concerned that certain covert Agency activities at an overseas detention and interrogation site might involve violations of human rights. In January 2003, OIG initiated a review of Agency counterterrorism detention and interrogations activities . . . .").

For the foregoing reasons, the CIA has failed to carry its burden of proving that the OIG reports are "deliberative" within the meaning of Exemption 5.

### C. The Withheld Information Contains Segregable Factual Information to which the Deliberative Process Privilege Does Not Extend.

Finally—even assuming that the withheld documents are predecisional and deliberative—the deliberative process privilege "applies only to the 'opinion' or 'recommendatory' portion of [a document], not to factual information which is contained in the document." *Coastal States Gas Corp.*, 617 F.2d at 867. Unless "inextricably intertwined" with exempt portions, facts in a predecisional document must be segregated and disclosed. *See Ryan v. Dep't of Justice*, 617 F.2d 781, 790–91 (D.C. Cir. 1980), *overruled on other grounds by Klamath*, 532 U.S. at 11–12.

There is ample record evidence that at least some of the information in the OIG reports is segregable factual information not subject to Exemption 5. The OIG's investigatory reports on detainee mistreatment and deaths, interrogation methods, overseas detention facilities, and counterterrorism operations must include factual details that are neither opinions nor

recommendations.  This information cannot be withheld under Exemption 5.  Moreover, the CIA

makes no claim that this information is not segregable from any properly withheld information;

one would expect that each OIG report, for example, begins with a discussion of the steps taken

to investigate a particular matter and includes the factual findings of that investigation, before

offering any opinions or recommendations, and that these segments of each report could easily

be released without revealing other portions that might validly be subject to an exemption.  Such

segregable material must be released.  *See* 5 U.S.C. § 552(b) ("Any reasonably segregable

portion of a record shall be provided to any person requesting such record after deletion of the

portions which are exempt under this subsection."); *see also Mead*, 566 F.2d at 260 ("The focus

of the FOIA is information, not documents, and an agency cannot justify withholding an entire

document simply by showing that it contains some exempt material.").

**III.    Exemption 7 Does Not Apply to the Withheld Reports.**

The CIA next argues that parts of the OIG reports are exempt from disclosure pursuant to

Exemption 7.  5 U.S.C. § 552(b)(7).[8]  Although it is possible that some or all of these reports

were "compiled for law enforcement purposes," it is equally possible that they were not created

for such purposes.  The CIA simply has failed to establish the threshold condition for application

of Exemption 7 to the requested records.  Even had the CIA satisfied the exemption's threshold

requirement, it has not and cannot make the second necessary showing: that any specific harm

will ensue from release of the information.

   ***A.   The CIA Has Not Established That the OIG Reports Were Compiled for Law
          Enforcement Purposes.***

---

[8] The CIA contends that portions of Documents 1–8 may be withheld pursuant to FOIA
Exemptions 7(C), (D), and (F).  Because the CIA fails to establish that Exemption 7 applies to
any of the withheld reports, those withholdings are improper.  Should the Court rule that
Exemption 7 does apply, however, the ACLU would not further challenge the portions of these
documents withheld under subsections (C), (D), and (F).

As a threshold matter, an agency withholding records under Exemption 7 must demonstrate that those records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7); *see also, e.g.*, *Campbell v. Dep't of Justice*, 164 F.3d 20, 31–32 (D.C. Cir. 1998). The CIA argues that, because the OIG Reports at issue "were created in connection with the CIA OIG's investigative and national-security functions . . . the withheld information satisfies the law-enforcement requirement for invocation [of Exemption 7]." CIA Br. at 21. The CIA's overbroad interpretation of "law enforcement" is unsupported by the record and at odds with precedent.

"[A]n agency's investigation of its own employees is for 'law enforcement purposes' only if it focuses 'directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.'" *Stern v . FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984) (quoting *Rural Hous. Alliance v. Dep't of Agric.*, 498 F.2d 73, 81 (D.C. Cir. 1974)).[9] By contrast, "an agency's general internal monitoring of its own employees to insure compliance with the agency's statutory mandate and regulations *is not protected* from public scrutiny under Exemption 7," because "protection of all such internal monitoring under

---

[9] The D.C. Circuit has clarified that this test "is less deferential to the agency's own characterization of its investigation than the test we set forth . . . in the context of *external* investigations." *Stern*, 737 F.2d at 89 (citation omitted; emphasis added).

The CIA argues that "as an agency with a [law enforcement] mandate, [it] is entitled to deference when, as here, it identifies material as having been compiled for law enforcement purposes under exemption (b)(7)." CIA Br. at 20. The CIA is *not*, however, an agency with a law enforcement mandate. *See* 50 U.S.C. § 403-4; *id.* § 403-4a(d)(1). Moreover, the Agency has failed to establish that the investigations in question were external rather than internal, or that any external investigations were "realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached." *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982). The more deferential standard of judicial review is thus inapplicable.

Exemption 7 would devastate FOIA." *Id.* (emphasis added). "The purpose of the 'investigatory files' is thus the critical factor." *Rural Hous. Alliance*, 498 F.2d at 82.

Although it "need not show that the investigation led to, or will lead to, adjudicative or enforcement proceedings," it is the government's burden to show "that the records it seeks to shelter under Exemption 7 were compiled for adjudicative or enforcement purposes." *Stern*, 737 F.2d at 88. The CIA has failed completely to carry this burden. In support of its Exemption 7 invocation, the Agency simply does not argue that the withheld documents focused "directly on specifically alleged illegal acts," or "particular identified officials," or on allegations "which could, if proved, result in civil or criminal sanctions." *Id.* at 89 (citation omitted).[10] Consequently, this Court should deny the CIA's summary judgment motion and order the release of the records withheld pursuant to this exemption.

### B. Release of the OIG Reports Would Not Interfere with Enforcement Proceedings.

Assuming the CIA *had* established that the withheld records were "compiled for law enforcement purposes," Exemption 7 only justifies withholding records if the agency can also demonstrate that "one of six specific harms" will ensue. *FBI v. Abramson*, 456 U.S. 615, 622 (1982); *see also, e.g.*, *Stern*, 737 F.2d at 88; *Pratt*, 673 F.2d at 413. The CIA declares that two OIG reports, Documents 7 and 8, have been properly withheld pursuant to Exemption 7(A), which exempts law enforcement records or information if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). An agency invoking this exemption must show "that the material withheld relates to a concrete prospective law enforcement proceeding." *Juarez v. Dep't of State*, 518 F.3d 54, 58 (D.C. Cir. 2008)

---

[10] *Cf. Kimberlin v. Dep't of Justice*, 139 F.3d 944, 947 (D.C. Cir. 1998) (holding an OPR investigation " conducted in response to and focused upon a specific, potentially illegal release of information by a particular, identified official" satisfied Exemption 7 threshold inquiry); *Stern*, 737 F.2d at 90–91; *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997).

(internal quotation marks and citations omitted).  In addition, the agency "must show that disclosure of those documents would, in some particular, discernible way, disrupt, impede, or otherwise harm the enforcement proceeding."  *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989); *see also, e.g.*, *Campbell v. Dep't of Health and Human Servs.*, 682 F.2d 256, 259 (D.C. Cir. 1982) ("[T]he government must show, by more than conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding").

The only support the CIA offers for its invocation of Exemption 7(A) is a single, speculative, and hearsay statement from IRO Lutz, who declares: "I understand that these reports are the focus of a pending investigation being conducted by the Department of Justice."  Lutz Decl. ¶ 51.  If this assertion is true, there is no reason why the Department of Justice (which represents the Agency here) could not submit an affidavit in sufficient detail to satisfy the statutory requirements.  The absence of such support for the CIA's withholding is both puzzling and fatal to the Agency's effort to withhold Documents 7 and 8.

In fact, in prior FOIA litigation over similar documents, the special prosecutor presiding over the related criminal investigation—the same special prosecutor in charge of the investigation to which the CIA alludes here—submitted a declaration invoking Exemption 7 and explaining how disclosure of the requested records might jeopardize his investigation.  *See* Ebadolahi Decl. Ex. E (Declaration of John H. Durham, *ACLU v. Dep't of Defense*, No. 1:04-cv-04151-AKH (S.D.N.Y. Nov. 24, 2009)).  That prosecutor has not filed an affidavit here, however, giving lie to the Agency's claim that additional disclosures under FOIA in this case would hinder any ongoing investigations.

Moreover, the Federal Rules of Civil Procedure make explicit that any affidavit or declaration submitted in support of a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Ms. Lutz does not have personal knowledge of the harm that might befall investigations being conducted by an entirely separate government agency. Her bald assertion is inadequate to carry the CIA's burden of proof, and summary judgment on the Exemption 7(A) withholding should be entered in favor of the ACLU. *See, e.g.*, *Morley v. CIA*, 508 F.3d 1108, 1121 (D.C. Cir. 2007) (holding that an explanation provided in an agency's brief to the court, but not made upon "personal knowledge" in the agency's affidavit, was insufficient to carry the agency's burden on summary judgment (citation omitted)); *Weisberg v. DOJ*, 627 F.2d 365, 369 (D.C. Cir.1980) (same); *Campbell*, 164 F.3d at 35 ("Given that the declarant presumably lacks personal knowledge of the particular [factual] events [underlying the claim of exemption], more information is needed before the court can conclude that exemption 7(D) applies."); *see also, e.g.*, *Linn v. Dep't of Justice*, No. 92-1406, 1995 WL 631847, at *11 (D.D.C. Aug. 22, 1995) ("Of particular relevance to the instant case, summary judgment may not be granted on the basis of affidavits containing hearsay not admissible under the Federal Rules of Evidence.").

**IV.     Given the Deficiencies in the CIA's Declaration and *Vaughn* Index, the Court Should, at a Minimum, Conduct an *In Camera* Review of the OIG Reports.**

In reviewing the validity of a FOIA exemption claim, a court "may examine the contents of [withheld] agency records *in camera* to determine whether such records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B). The decision whether to undertake *in camera* review is left to the trial court's discretion. *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998). Nevertheless, summary judgment without *in camera* review is appropriate only

where the government's affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith." *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 22 (D.C. Cir. 1984). "While *in camera* examination need not be automatic, in many situations it will plainly be necessary and appropriate." *Ray v. Turner*, 587 F.2d 1187, 1193 (D.C. Cir. 1978). "The ultimate criterion is simply this: Whether the district judge believes that *in camera* inspection is needed in order to make a responsible *de novo* determination on the claims of exemption." *Spirko*, 147 F.3d at 996 (quoting *Ray*, 587 F.2d at 1195) (internal quotation marks omitted).

As this brief makes clear, the CIA has failed to carry its burden of proof to establish that the FOIA exemptions it invokes justify the withholding of the OIG reports. A trial judge may order *in camera* review merely "on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a *de novo* determination." *Ray*, 587 F.2d at 1195; *see also Meeropol v. Meese*, 790 F.2d 942, 958 (D.C. Cir. 1986) (same). Plaintiffs respectfully submit that in this case—where the Agency has invoked FOIA exemptions without adequate proof to withhold, in their entirety, reports compiled by its independent watchdog entity—*in camera* review is necessary, at a minimum, to ensure that FOIA's purpose is fulfilled. The record indicates that the OIG reports relate to unauthorized activities that fell far outside the scope of the CIA's statutory mandate. *See Jones v. FBI*, 41 F.3d 238, 242–43 (6th Cir. 1994) ("Even where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself there may be evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue. Where such evidence is strong, it would be an abdication of the court's responsibility to treat the case in the standard way and grant summary judgment on

the basis of *Vaughn* affidavits alone."). The American public has a right to access these critical historical documents so that these mistakes are less likely to be repeated in the future.

## CONCLUSION

Because the CIA has no valid basis for withholding the OIG reports, the Court should deny the Agency's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment. The Court should order the CIA to release the portions of the OIG reports describing the use of unauthorized techniques. In the alternative, and at a minimum, the Court should conduct an *in camera* inspection of the reports in order to satisfy its statutory obligation to conduct a *de novo* review of Agency withholdings and to ensure that all segregable information is released.

Respectfully submitted,

 /s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com

 /s/ Mitra Ebadolahi
Mitra Ebadolahi (*pro hac vice*)
Alexander A. Abdo (*pro hac vice*)
Jameel Jaffer (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7305
Fax: (212) 549-2654
mebadolahi@aclu.org
February 17, 2012                      aabdo@aclu.org

*Counsel for Plaintiffs*

32