# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION *et al.*,

        Plaintiffs,

   v.

CENTRAL INTELLIGENCE AGENCY,

        Defendant.

No. 1:11-cv-0933 (ABJ)

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

 /s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 457-0805
artspitzer@gmail.com

 /s/ Mitra Ebadolahi
Mitra Ebadolahi (*pro hac vice*)
Alexander A. Abdo (*pro hac vice*)
Jameel Jaffer (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7305
Fax: (212) 549-2654
mebadolahi@aclu.org

March 20, 2012              *Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

I.     Exemptions 1 and 3 Do Not Apply to Descriptions of Unauthorized Activities or Techniques. ................................................................................................................... 4

        *A.*     *Unauthorized Activities and Techniques Cannot Be Withheld as "Intelligence Sources or Methods."* ...................................................... 6

        *B.*     *Even If the CIA Had Satisfied the Threshold Requirement for Exemption 1, the Agency's Assessment of Potential Harm is Neither Plausible Nor Logical.* ........................................................................................................... 14

II.    Exemption 5 Does Not Apply to the Withheld Descriptions Because They Are Neither Predecisional Nor Deliberative. ........................................................................... 16

        *A.*     *The CIA Has Failed to Establish that the Withheld Documents Are Predecisional and Deliberative.* .......................................................... 16

        *B.*     *The Withheld Documents Include Segregable Factual Information That Must Be Disclosed.* ................................................................................... 19

III.   The Court Should Hold Its Ruling on Documents 7 and 8 in Abeyance Pending the Imminent Conclusion of Mr. Durham's Investigation. ............................................. 21

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Access Reports v. Dep't of Justice*, 926 F.2d 1192 (D.C. Cir. 1991)............................................ 16

*ACLU v. Dep't of Def.*, 628 F.3d 612 (D.C. Cir. 2011) ................................................................ 8

*Agee v. CIA*, 524 F. Supp. 1290 (D.D.C. 1981).......................................................................... 9

*Am. Jewish Cong. v. Kreps*, 574 F.2d 624 (D.C. Cir. 1978)....................................................... 13

*CIA v. Sims*, 471 U.S. 159 (1985) ..................................................................... 2, 6, 7, 13

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)...................... 16, 18

*Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824 (D.C. Cir. 1979) .......... 8, 13

*Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366 (D.C. Cir. 2005)..................................... 19

*Lesar v. Dep't of Justice*, 636 F.2d 472 (D.C. Cir. 1980)......................................................... 8, 9

*Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977)............................. 20

*Milner v. Dep't of Navy*, 131 S. Ct. 1269 (2011) ...................................................................... 20

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................ 13

*Navasky v. CIA*, 499 F. Supp. 269 (S.D.N.Y. 1980)......................................................... 3, 6, 7, 10

*People for the Am. Way Found. v. Nat'l Sec. Agency*, 462 F. Supp. 2d 21 (D.D.C. 2006) ............................................................................................................... 11

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) ..................................................................... 3, 14

*Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980), *overruled on other grounds by Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) ................. 20

*Senate of Puerto Rico ex rel Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987).............................................................................................................. 18

*Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899 (N.D. Ill. 2006)................................................ 10, 11

*Wash. Post v. Dep't of Def.*, 766 F. Supp. 1 (D.D.C. 1991) ....................................................... 15

*Weissman v. CIA*, 565 F.2d 692 (D.C. Cir. 1977).................................................................... 6, 7

**Statutes**

5 U.S.C. § 552 .................................................................................................................... 3

50 U.S.C. § 403q ......................................................................................................... 17, 18

50 U.S.C. § 431 ............................................................................................................ 12, 17

**Other Authorities**

Karen A. Winchester & James W. Zirkle, *Freedom of Information and the CIA Information Act*, 21 U. Rich. L. Rev. 231 (1987) ..................................................... 11

Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda Operative* (Aug. 1, 2002) ......................................................................................... 7

*The Freedom of Information Act: Central Intelligence Agency Exemptions: Hearing on H.R. 5129, H.R. 7055, and H.R. 7056 Before the Subcomm. on Gov't Info. and Individual Rights of the H. Comm. on Gov't Operations*, 96th Cong. (1980) ......................... 12

**INTRODUCTION**

This suit involves a narrow category of government information: reports compiled by the Office of the Inspector General (OIG) of the Central Intelligence Agency (CIA).

Following the government's August 2009 release of an OIG report examining the CIA's "enhanced interrogation" program—the *Special Review*—the American public learned for the first time of, among many other things, agency interrogators' use of techniques the CIA apparently never authorized. The unauthorized conduct included physical threats (using an unloaded handgun and a power drill to terrorize a detainee), psychological threats (telling one detainee that his children would be killed and another that his female relatives raped, and subjecting a third detainee to a mock execution), and physical abuse (choking a detainee to the point of unconsciousness three times). *See* Decl. of Mitra Ebadolahi, Ex. A (Cent. Intelligence Agency, Inspector Gen., Special Review: Counterterrorism Detention and Interrogation Activities (September 2001 – October 2003) (May 7, 2004), *available at* http://bit.ly/hEVzu8) ECF No. 19-3 ("*Special Review*") 42–43, 70–71. The OIG declared that these activities were unauthorized when they occurred and indicated that it would document the unauthorized conduct in greater detail in additional reports. *Id.* at 41–43 & n.46; 69–73.

This Freedom of Information Act (FOIA) suit concerns those additional OIG reports and their description of conduct that not even the CIA itself considered to be authorized. Release of this information is of crucial importance to an ongoing debate about the abuses that took place in connection with the CIA's detention and interrogation program. The public has a right to know the full scope of these abuses and to assess for itself whether our government has done enough to ensure that such abuses do not recur.

The CIA argues to the contrary, contending, first, that it should not be required to "confirm or deny" that the withheld reports concern the use of unauthorized interrogation methods, and, second, that even if the reports concern the use of unauthorized methods, the Agency has the authority to withhold them because even unauthorized methods are "intelligence sources and methods" within the meaning of FOIA Exemptions 1 and 3. *See* Reply Mem. in Further Supp. of Def.'s Mot. for Summ. J. & in Opp'n to Pls.' Cross-Mot. for Summ. J., ECF No. 21 ("CIA Reply") 1, 4–12. Neither argument has merit. The CIA has already confirmed through other official disclosures that the requested reports concern the use of unauthorized interrogation methods. And neither Exemption 1 nor Exemption 3 gives the CIA the authority to withhold this kind of information from the public. As the Supreme Court made clear in *CIA v. Sims*, the CIA's authority to protect "intelligence sources and methods" is broad, but it is not boundless; it is limited to those methods that "fall within the Agency's mandate." 471 U.S. 159, 169 (1985). Techniques that even the CIA itself considered unauthorized do not even arguably "fall within the Agency's mandate" and therefore are not "intelligence methods" within the meaning of FOIA. The CIA's reliance on cases involving illegal (as opposed to unauthorized) activity is misplaced, and in any event the CIA misinterprets the cases it cites.

The CIA argues, too, that certain portions of the withheld reports are protected under Exemption 5 because they relate to the deliberative process. This argument fails because the Agency has failed to establish that the information requested—purely factual descriptions of unauthorized conduct that occurred in the past—is either predecisional or deliberative, much less both. The Agency's contention that two of the reports may be withheld under Exemption 7 is more persuasive, but the affidavit of Special Prosecutor John Durham makes clear that the

related criminal investigation is near completion; accordingly, this Court should simply order the CIA to release the segregable portions of these reports when the investigation is complete.

The CIA urges the Court simply to defer to its affidavits, but the deference sometimes given to the CIA in FOIA cases should not be afforded the Agency here. The Agency's failure to recognize its prior acknowledgement that the OIG reports concern investigations into *unauthorized* activities makes clear that the CIA's affidavits are incomplete and, therefore, unreliable. In these circumstances, and in order to satisfy the statutory command that it conduct a *de novo* review of the claimed exemptions, *see* 5 U.S.C. § 552(a)(4)(B), the Court should conduct *in camera* review of the eleven OIG reports and order the disclosure of segregable descriptions of unauthorized conduct. *See, e.g.*, *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("*In camera* inspection does not depend on a finding or even tentative finding of bad faith. A judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a *de novo* determination. Government officials who would not stoop to misrepresentation may reflect an inherent tendency to resist disclosure, and judges may take this natural inclination into account."); *see also, e.g.*, *Navasky v. CIA*, 499 F. Supp. 269, 272 (S.D.N.Y. 1980) ("*In camera* inspection is essential to responsible *de novo* determination where the agency's public description of the withheld material is insufficient to allow the court to determine whether its nature is such as to justify nondisclosure under the claimed exemption, or where the court, based on the record before it, wishes to satisfy an 'uneasiness' or 'doubt' that the exemption claim may be overbroad." (citing *Ray*, 587 F.2d at 1195)).

**ARGUMENT**

**I.     Exemptions 1 and 3 Do Not Apply to Descriptions of Unauthorized Activities or Techniques.**

The only information at issue in this FOIA case is information concerning the use of unauthorized activities and techniques.  Such conduct exceeds the CIA's mandate and is not withholdable as an "intelligence source and method" within the meaning of Exemptions 1 and 3. The CIA—perhaps realizing the narrow scope of Plaintiffs' position—attempts to obfuscate the issue by relying upon cases relating to *illegal* activities.  Though not relevant here, those cases are consistent with Plaintiffs' argument.

Before addressing those legal arguments, however, a factual clarification is warranted. The CIA attempts to sidestep the thrust of Plaintiffs' argument by refusing to "confirm or deny whether any of the withheld reports concern unauthorized interrogation methods."  CIA Reply 1. The problem with this argument is that the CIA has already acknowledged, in previous disclosures, that its interrogators engaged in conduct that neither the Agency nor the OIG regarded as authorized.  The *Special Review*, for example, cites the OIG's investigations into "specific unauthorized or undocumented techniques," including the use of an unloaded handgun and power drill to threaten a detainee during an interrogation.  *Special Review* 41–42 & n.46. The *Special Review* also identifies "other techniques that caused concern because [the Department of Justice] had not specifically approved them.  These included the making of threats, blowing cigar smoke, employing certain stress positions, the use of a stiff brush on a detainee, and stepping on a detainee's ankle shackles."  *Id.* at 41.  One interrogator threatened to sexually abuse Al-Nashiri's female relatives in the detainee's presence.  *Id.* at 42–43.  Other interrogators threatened Khalid Sheikh Mohammed by telling him: "We're going to kill your children."  *Id.* at 43.  Elsewhere, the *Special Review* documents an officer's use of a "pressure

point" technique on a detainee: the officer put "both of his hands on the detainee's neck, [and] manipulated his fingers to restrict the detainee's carotid artery." *Id.* at 69.  This continued until "the detainee would nod and start to pass out," at which point the officer "shook the detainee to wake him.  This process was repeated for a total of three applications on the detainee." *Id.* at 70.  Significantly, the *Special Review* notes that "[t]he use of pressure points is not, and had not been, authorized, and CTC has advised the [redacted] that such actions are not authorized." *Id.* at 70.

Indeed, the *Special Review* makes clear not only that some personnel engaged in unauthorized conduct, but that this conduct resulted in the deaths of several detainees.  The *Special Review* refers, for example, to an Afghan citizen's four-day detention at the Asadabad base in northeastern Afghanistan.  During that time, "an Agency independent contractor, who was a paramilitary officer, is alleged to have severely beaten the detainee with a large metal flashlight and kicked him during interrogation sessions.  The detainee died in custody on 21 June . . . ." *Id.* at 79.  The *Special Review* indicates that the CIA had not authorized this abuse. *See also id.* ("Neither the contractor nor his Agency staff supervisor had been trained *or authorized* to conduct interrogations."  (emphasis added)).

The *Special Review* notes that the OIG investigated these unauthorized activities.  The withheld reports in this case are the results of those investigations.  It is too late in the day for the CIA to contend cryptically that it "need not confirm or deny whether any of the withheld reports concern unauthorized interrogation methods."  The record establishes this basic fact; the CIA's counterfactual assertion to the contrary cannot be accepted.[1]

---

[1] For the same reasons, the CIA's challenges to Plaintiffs' statement of material facts are unavailing. *See* Central Intelligence Agency's Counterstatement of Material Facts, ECF No. 21-1.  The Agency itself has acknowledged the existence of its post-9/11 interrogation and detention program and released an OIG report—the *Special Review*—detailing various investigations into unauthorized activities and techniques associated with that program.

**A. Unauthorized Activities and Techniques Cannot Be Withheld as "Intelligence Sources or Methods."**

Plaintiffs' opening brief established that the CIA may not label, as protectable "intelligence sources or methods," interrogation techniques that even the Agency itself considered unauthorized at the time the techniques were used. Exemptions 1 and 3 protect "intelligence sources and methods" from disclosure under FOIA. As *CIA v. Sims* makes clear, however, the phrase "intelligence sources and methods"—though broad—does not encompass conduct that falls outside of the CIA's mandate. 471 U.S. 159 (1985); *id.* at 169 (rejecting the FOIA requestors' invitation to insert "any limiting definition [for the term 'intelligence sources and methods'] that goes beyond the requirement that the information *fall within the Agency's mandate* to conduct foreign intelligence" (emphasis added)). The CIA may not rely on Exemptions 1 and 3 to withhold the descriptions of unauthorized conduct.

At least two decisions confirm this understanding of the phrase "intelligence methods."[2] In *Weissman v. CIA*, the D.C. Circuit held that the phrase "intelligence sources and methods" did not protect the CIA's domestic investigation of an individual because the CIA's charter forbade the Agency from undertaking domestic law-enforcement activities. 565 F.2d 692, 695–96 (D.C. Cir. 1977).[3] Likewise, in *Navasky v. CIA*, a district court rebuffed the CIA's designation of

---

[2] Although the relevant authorities refer to "intelligence sources and methods," this case concerns only the CIA's claim that certain activities—such as the use of a handgun and power drill to threaten a detainee during an interrogation—are "intelligence methods." Plaintiffs thus use the phrase "intelligence methods" throughout. To the extent that the CIA believes that the descriptions of unauthorized activities and techniques may be withheld as "intelligence sources," however, the same analysis as that discussed in this Reply would still apply.

[3] *Weissman* primarily concerned withholding under Exemption 7, but its analysis focused on the meaning of the phrase "intelligence sources and methods" within the National Security Act of 1947. 565 F.2d at 695–96. The court concluded that "intelligence sources and methods" did not encompass domestic investigations because the CIA is not authorized to undertake such investigations. *Id.* at 696 ("Thus, the Agency's interpretation *of the sources and methods proviso* is misplaced. A full background check within the United States of a citizen who never had any

"clandestine book publishing activities" as "intelligence methods," because those activities were not "contemplated by Congress" in the CIA's charter.  499 F. Supp. at 274–75.  *Sims*, *Weissman*, and *Navasky* do not suggest that records that would otherwise be withholdable lose their protection under FOIA simply because they describe conduct that is unauthorized; it is conceivable that in some circumstances an agency would be able to withhold such records because disclosing them would inevitably disclose information about *authorized* methods.  These cases do make clear, however, that the unauthorized conduct cannot *itself* be the basis for withholding.

Muddying the water, the CIA conflates *illegal* activities with *unauthorized* activities. CIA Reply 4–6, 11.  These terms are not synonymous.  Illegal but authorized activities include, for example, the use of waterboarding, which contravenes the prohibition on torture, but which senior government officials authorized CIA interrogators to use.  *See, e.g.*, Memorandum from Jay S. Bybee to John A. Rizzo, *Interrogation of al Qaeda Operative* 3–4, 11, 15, 18 (Aug. 1, 2002) *available at* http://www.justice.gov/olc/docs/memo-bybee2002.pdf (authorizing waterboarding).  Unauthorized activities, by contrast, were *never* approved or condoned by the CIA or any other government entity.

For this reason, the CIA's reliance upon FOIA cases discussing illegality is misplaced: Plaintiffs' argument turns on the undisputed fact that the techniques described in the OIG reports were unauthorized.  But, in any event, the CIA misconstrues the caselaw on legality.  Briefly, the cases cited by the Agency stand for two broad propositions: first, that the mere fact that a document describes illegal activity does not compel the document's disclosure, and second, that there is a limit to the CIA's authority to withhold "intelligence sources and methods."

relationship with the CIA *is not authorized*, and the law-enforcement exemption is accordingly unavailable."  (emphases added)).

The only way to reconcile these two propositions is to recognize, as the D.C. Circuit did in *Founding Church of Scientology v. National Security Agency*, that "[a]lthough [the government] would have no protectable interest in suppressing information simply because its release might uncloak an illegal operation, it may properly withhold records gathered illegally if divulgence would reveal *currently viable* information channels, albeit ones that were abused in the past."  610 F.2d 824, 829 n.49 (D.C. Cir. 1979) (emphasis added).  In other words, descriptions of illegal conduct may in some cases be withholdable, but the illegal—or unauthorized—conduct may not itself form the basis for the government's withholding.

All of the cases cited by the government are consistent with this distinction.  The CIA first relies on *ACLU v. Department of Defense*, 628 F.3d 612 (D.C. Cir. 2011), which rejected the argument "that illegal activities cannot produce classified documents."  *Id.* at 622.  Plaintiffs do not challenge that broad proposition, but this case differs from that one in two critical respects.  First, the D.C. Circuit did *not* consider whether the CIA can classify descriptions of activities that even the Agency recognized to be outside its mandate at the time the conduct took place.  Second, the D.C. Circuit held only that illegal activities could produce classified documents, *id.*; it did not hold that the illegal activity could itself be labeled an "intelligence method" and therefore form the basis for the classification.  This distinction is a critical one.  Plaintiffs do not claim that the OIG reports must be released in their entirety because they describe unauthorized conduct.  Rather, Plaintiffs maintain that descriptions of unauthorized conduct must be segregated from other information in the reports that is properly subject to a FOIA exemption.

The Agency's reliance on *Lesar v. Department of Justice*, 636 F.2d 472 (D.C. Cir. 1980), is likewise misplaced.  *See* CIA Reply 4.  In that case, the D.C. Circuit held only that a

generalized allegation of impropriety would not defeat a specific and *otherwise valid* claim of exemption:

> Although the FBI's surveillance of Dr. King strayed beyond the bounds of its initial lawful security aim, that does not preclude the possibility that the actual surveillance documents and the Task Force materials that comment upon those documents may nevertheless contain information of a sensitive nature, the disclosure of which could compromise legitimate secrecy needs.  In this case, Special Agent Small averred that disclosure of the Task Force summaries would reveal an intelligence source. . . . [T]he bare assertion that the Task Force summaries cannot contain information of a sensitive nature because the overall purpose of the FBI's original investigation of Dr. King was unrelated to a legitimate national security aim will not suffice.

636 F.2d at 483.  Unlike *Lesar*, this case involves specific instances of unauthorized Agency activities—not merely alleged by Plaintiffs, but conceded by the CIA's own Inspector General in the *Special Review*.

In *Agee v. CIA*, 524 F. Supp. 1290 (D.D.C. 1981), the district court similarly distinguished between evidence of illegal activity and information that would reveal validly withheld secrets.  The court, having completed an *in camera* review of the twenty-five documents there in issue, "acknowledge[d] that the documents describe aspects of the CIA's efforts which raise unanswered and in some respects serious questions as to the legality of the CIA's conduct."  *Id.* at 1293.  The court nonetheless concluded that "[t]hese two threads are tightly interwoven so that it is not possible to isolate facts bearing solely on possible illegalities from *facts that are properly claimed to be exempt* under (b)(1) or (b)(3)."  *Id.* (emphasis added). *Agee*, therefore, stands only for the uncontroversial proposition that, sometimes, information regarding illegal activity cannot meaningfully be segregated from other, properly classified facts. The *Agee* court reached its conclusion only *after* it had reviewed the Agency's submissions *in camera* and evaluated the exemptions claimed *de novo*, as FOIA requires.  The case thus also supports the Plaintiffs' request that this Court undertake *in camera* review of the eleven withheld

reports to ensure that information pertaining to unauthorized activities and techniques, not otherwise exempt under FOIA, be released.

Finally, the CIA's reliance on dicta from *Navasky*, relating to the irrelevance of allegations of illegality to withholding, should not distract from two essential points about that case. First, as with many of the cases the CIA cites, *Navasky* simply concluded that "illegality is not a bar to an *otherwise valid* justification" for exemption. 499 F. Supp. at 273 (emphasis added). It does not suggest that illegal—or, as relevant here, unauthorized—activities may *themselves* qualify as valid "intelligence methods." Second, *Navasky* ultimately held that the putative source or method at issue—book-publishing propaganda—could not be withheld because it was not authorized by the CIA's charter and therefore was not an "intelligence source or method." *Id.* at 274–75 ("[N]othing in the legislative history of the [National Security] Act [of 1947] indicates that covert propaganda activities of the kind involved here were contemplated by Congress. It is therefore doubtful that the term 'intelligence' . . . was intended to include such activities. . . . The 'intelligence sources and methods' language of [the National Security Act], therefore, cannot be applied to protect authors, publishers and books involved in clandestine propaganda activities from disclosure." (citations omitted)). Plaintiffs urge the same analysis here: the unauthorized activities described in the withheld reports do not fall within the scope of the CIA's charter, and thus may not be withheld pursuant to Exemptions 1 and 3 as "intelligence methods."

The fundamental problem with the CIA's position is that it would allow the Agency to be the architect of its own immunity from disclosure under FOIA, no matter how concededly unauthorized the conduct at issue. *See generally Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 905 (N.D. Ill. 2006) (expressing concern that the NSA's interpretation of its withholding statute,

which is similar to the CIA's withholding statute here, would "if . . . taken to its logical

conclusion, . . . allow the federal government to conceal information regarding blatantly illegal

or unconstitutional activities simply by assigning these activities to the NSA or claiming they

implicated information about the NSA's functions"); *People for the Am. Way Found. v. Nat'l*

*Sec. Agency*, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) (agreeing with the court in *Terkel* that that

NSA's withholding authority is "not without limits").

The CIA claims that "intelligence sources and methods" are not limited to activities

authorized by the Agency.  CIA Reply 6.  More breathtaking still, the CIA goes on to argue that,

because "the withheld intelligence sources and methods were 'undertaken in support of' or were

'related to' the CIA's detention and interrogation program . . . those activities [were] within the

Agency's mandate of conducting foreign intelligence *whether or not the activities themselves*

*were authorized*."  *Id.* at 7 (original emphasis omitted; new emphasis supplied; citations

omitted).  According to this logic, any activity that the CIA deems to have been "undertaken in

support of" or "related to" a particular Agency program will qualify as an "intelligence source or

method" that may be withheld pursuant to Exemptions 1 and 3.  If this were true, the CIA would

be exempt from FOIA, as it could unilaterally assert that any specific Agency activity was

"undertaken in support of" or "related to" some program, thus qualifying as a withholdable

"intelligence source or method."

Such a result would be at odds with the purpose of FOIA, both generally and as Congress

intended the statute to apply to the CIA specifically.  Throughout the 1970s and early 1980s, CIA

officials attempted again and again to convince legislators that the Agency should be exempt

altogether from FOIA's disclosure requirements.  *See, e.g.*, Karen A. Winchester & James W.

Zirkle, *Freedom of Information and the CIA Information Act*, 21 U. Rich. L. Rev. 231, 255–60

(1987); *see also, e.g.*, *The Freedom of Information Act: Central Intelligence Agency Exemptions*:
*Hearing on H.R. 5129, H.R. 7055, and H.R. 7056 Before the Subcomm. on Gov't Info. and
Individual Rights of the H. Comm. on Gov't Operations*, 96th Cong. 24 (1980) (statement of
Frank C. Carlucci, Deputy Director of CIA), *available at* http://bit.ly/GBVwXA ("While it is for
the people, through their elected Representative in Congress, to decide whether the best interests
of the Nation are served by the application of general openness concepts to intelligence
activities, it is our position that the best interests of the Nation are not so served.  My theme
today, therefore, is that the current application to the CIA of public disclosure statutes like the
Freedom of Information Act seriously damage the Agency's ability to do its job.").  Although
Congress credited several of the CIA's logistical and security concerns, it rejected the Agency's
request for a blanket exemption from FOIA.

 Rather, as explained in Plaintiffs' opening brief, Congress exempted only the CIA's
operational files.  *See* 50 U.S.C. § 431(a).  But operational files do not include OIG files.
Indeed, Congress expressly carved out an exception to the "operational file" exemption to make
clear that FOIA *does* apply to the precise information sought here: information relating to OIG
investigations of improper or unauthorized conduct.  *See id.* § 431(c)(3) ("exempted operational
files shall continue to be subject to search and review for information concerning . . . the specific
subject matter of an investigation by . . . the Office of Inspector General of the Central
Intelligence Agency . . . for any impropriety, or violation of law, Executive order, or Presidential
directive, in the conduct of an intelligence activity").  The CIA's claim—that even descriptions
of unauthorized conduct in OIG files are protectable as "intelligence methods"—would thwart
Congress' specific decision to place meaningful limits on the CIA's immunity from FOIA.

Courts have long recognized that the "unmistakable thrust" of provisions such as Exemptions 1 and 3 "is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628 (D.C. Cir. 1978) (footnote omitted); *see also, e.g.*, *Founding Church of Scientology*, 610 F.2d at 829 ("To be sure, the legislation's scope must be broad in light of the [NSA's] highly delicate mission.  But a term so elastic as 'activities' should be construed with sensitivity to the 'hazard(s) that Congress foresaw.'" (footnote omitted)).  Here, accepting the CIA's argument— that it can exempt information from FOIA disclosure simply by declaring that a given activity was "undertaken in support of" or "related to" some Agency program—would eviscerate legislative intent.  The very purpose of FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Should the CIA be allowed to determine the breadth of its own withholding authority, without regard for Congressional limits on that authority, FOIA would be a dead letter.

To summarize: This litigation pertains only to descriptions in the eleven OIG reports of activities that even the CIA considered at the time to be unauthorized.  As *Sims* makes clear, for information to be withheld as an "intelligence source or method," it must "fall within the [CIA's] mandate to conduct foreign intelligence."  471 U.S. at 169.  Activities the CIA itself concedes were unauthorized may not be classified as "intelligence sources or methods."  The CIA's motion for summary judgment, to the extent it is premised on the claim that those unauthorized techniques are "intelligence methods," must be denied.  At a minimum, the Court should conduct

an *in camera* review of the eleven withheld reports to ensure that all segregable material relating to unauthorized activities and techniques is released without further delay.

### B. Even If the CIA Had Satisfied the Threshold Requirement for Exemption 1, the Agency's Assessment of Potential Harm is Neither Plausible Nor Logical.

The foregoing makes plain that the CIA cannot satisfy the threshold condition for the application of Exemptions 1 or 3: namely, establishing that the withheld information pertains to "intelligence sources and methods." That fact alone defeats the CIA's claims under both Exemptions 1 and 3. The Court therefore need not address the CIA's further claim under Exemption 1 that disclosure of the requested information reasonably can be expected to damage national security. *See* CIA Reply 9. Nevertheless, the CIA's prediction of harm is illogical given its prior disclosures and the limited information Plaintiffs seek.

The Agency argues that the Court must defer to its assessment of potential harm so long as its arguments are both plausible and logical. *Id.* Its claims are neither. *See generally Ray*, 587 F.2d at 1193–94 (explaining that Congress "stressed the need for an objective, independent judicial determination, and insisted that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security" (footnote omitted)).

The CIA contends that disclosure "would reveal U.S. intelligence needs, priorities, and capabilities to a foreign intelligence service or hostile organization seeking to take advantage of any national security weakness." CIA Reply 10 (quoting Lutz Decl. ¶ 30). According to the CIA, such revelations would damage the national security because "foreign government services and hostile organizations would be put on notice that their activities and information had been targeted by the CIA," "future intelligence collection activities would be made more difficult," and as a result, "the conduct of such operations would become even more dangerous." *Id.*

These broad and generic claims of harm make little sense given the limited information Plaintiffs seek.  Plaintiffs do *not* seek information that would disclose the CIA's intelligence needs, priorities, or capabilities.  To repeat: this lawsuit involves a request for information regarding solely *unauthorized* activities or techniques, such as the use of a handgun or power drill to threaten a detainee—conduct which the CIA itself considered to be unauthorized at the time the events transpired.

Moreover, the CIA does not even attempt to grapple with the fact that some of the information Plaintiffs seek has already been released in the *Special Review*.  As explained, that document contains precisely the type of information sought in this FOIA litigation: descriptions of activities and techniques that the CIA has itself conceded were unauthorized at the time. Given the fact that such information has been released, the Agency's generic claims of harm are implausible and illogical.  *See, e.g.*, *Wash. Post v. Dep't of Def.*, 766 F. Supp. 1, 12–13 (D.D.C. 1991) (once a plaintiff "point[s] to specific information in the public domain that appears to duplicate that being withheld," the agency then "bear[s] the burden of comparing the proffered information with the information being withheld, determining whether the information is identical, and, if it is not, determining whether release of the perhaps only slightly different information being withheld would harm the national security" (internal quotation marks omitted)).

The CIA wants this Court to assume that the release of descriptions of *unauthorized* activities and techniques would somehow compromise the Agency's foreign intelligence mission.  But such an assumption could be true only if the CIA were planning to use these techniques again in the future, which the Agency does not and cannot assert.  The CIA's efforts

to withhold the requested information pursuant to Exemption 1 do not satisfy the basic legal

requirements of that provision, and cannot stand.

## II. Exemption 5 Does Not Apply to the Withheld Descriptions Because They Are Neither Predecisional Nor Deliberative.

As detailed in the Plaintiffs' opening brief, the deliberative process privilege requires two

showings: first, that the withheld information is predecisional, and second, that it is deliberative.

*See, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  The

Agency has failed to establish either requirement.  But even assuming the privilege applies, the

Agency independently has failed to segregate purely factual information from the reports.  That

requirement is critical in this case, because the OIG reports undoubtedly contain purely factual

descriptions of the unauthorized conduct.

### A. The CIA Has Failed to Establish that the Withheld Documents Are Predecisional and Deliberative.

The CIA has failed to establish that the OIG reports were predecisional.  The Agency

makes no showing that the reports were "generated before the adoption of agency policy," nor

does it identify a decisionmaking process to which the reports contributed.  *See, e.g.*, *Coastal

States Gas Corp.*, 617 F.2d at 866; *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C.

Cir. 1991).  Likewise, the CIA has not carried its burden of showing that the OIG reports were

deliberative—that is, that the information withheld includes "recommendations, draft documents,

proposals, suggestions, and other subjective documents which reflect the personal opinions of the

writer rather than the policy of the agency," or "which would inaccurately reflect or prematurely

disclose the views of the agency, suggesting as agency position that which is as yet only a

personal position."  *Coastal States Gas Corp.*, 617 F.2d at 866.  Exemption 5, therefore, does not

apply.  *See id.*

16

In insisting that the OIG reports are predecisional, the CIA overlooks the fact that the OIG is an independent entity tasked with "detect[ing] fraud and abuse in [CIA] programs and operations." 50 U.S.C. § 403q(a)(2).  The Agency likewise entirely ignores record evidence showing that at least some, if not all, of the withheld OIG reports were undertaken to detect fraud and abuse in past Agency programs, rather than to recommend forward-looking policies to improve Agency operations.

The CIA contends that although the OIG reports in question concern past policy decisions, the OIG generally "refers its findings, conclusions and recommendations to CIA management, typically heads of independent offices and operative officials, who in turn determine whether to take any administrative action on those findings, conclusions, and recommendations." CIA Reply 13 (emphasis and citation omitted).  The Agency seems to suggest that this is sufficient to categorize information as "predecisional."  Yet, were such generalizations sufficient, *every* OIG report would be exempt pursuant to the deliberative process privilege on account of the *possibility* that the OIG may refer certain findings, conclusions, and recommendations to CIA management for evaluation and potential response.  As already explained, Congress specifically crafted the CIA Information Act of 1984 to ensure that FOIA applied to information relating to OIG investigations of improper, illegal, or unauthorized conduct—that is, precisely the type of information Plaintiffs here seek.  *See* 50 U.S.C. § 431(c)(3).

Tellingly, the CIA fails to address any of the many cases Plaintiffs cited regarding the common-sense limitations of Exemption 5's "predecisional" prong.  *See* Pls.' Opp'n to Def.'s Mot. for Summ. J. and Cross-Mot. for Summ. J., ECF No. 19 ("Pls.' MSJ") 20–21 (citing cases). Those cases explain how an overly broad interpretation of the term "predecisional" would

swallow the presumption of disclosure under FOIA.  *See, e.g.*, *Coastal States Gas Corp.*, 617 F.2d at 868 ("Characterizing these documents as 'predecisional' simply because they play into an ongoing audit process would be a serious warping of the meaning of the word.  No 'decision' is being made or 'policy' being considered. . . .").  For this reason, courts have interpreted the term "predecisional" narrowly, requiring the government to identify a decision or decisional process for which the withheld information was prepared.  The CIA has not done so here because it cannot.

Likewise, the CIA ignores Plaintiffs' explanations for why the withheld reports are not "deliberative."  As previously explained, the deliberative process privilege is designed to protect "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Id.* at 866.  The CIA fails to present any evidence to show that the withheld documents satisfy one or more deliberative quality.

The Agency also overlooks germane precedent describing deliberative qualities.  This Circuit has held that factors such as "the nature of the decisionmaking authority vested in the officer or person issuing the disputed document" and "the relative positions in the agency's 'chain of command' occupied by the document's author and recipient" are relevant in determining whether a document is, in fact, "deliberative."  *Senate of Puerto Rico ex rel Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574, 586 (D.C. Cir. 1987) (internal quotation marks and citations omitted).  The CIA does not dispute the plain fact that the Inspector General is an independent overseer who is not a part of the same "chain of command" or hierarchy as CIA leadership or Agency decisionmakers.  *See* 50 U.S.C. § 403q(a)(1), (b)(1), (c)(1).  Nor does the CIA deny that the *Special Review* indicates that the withheld reports were independent

evaluations of past Agency programs, undertaken out of concerns that individuals working for or with the CIA had engaged in unauthorized conduct.

Merely repeating the elements necessary for a proper Exemption 5 claim, as the Agency has done in its brief, is insufficient to actually satisfy those requirements.  The CIA's failure to establish that any of the withheld reports were, in fact, predecisional and deliberative is fatal to its Exemption 5 claim.

### B. The Withheld Documents Include Segregable Factual Information That Must Be Disclosed.

Plaintiffs' opening brief showed that the CIA has failed to segregate factual information for release from the OIG reports.  Pls.' MSJ 25–26.  That requirement—firmly established by this Circuit's precedent on the deliberative process privilege—is vital in this case because Plaintiffs seek only factual descriptions of the unauthorized interrogation techniques.

The CIA's response reflects a basic misunderstanding of the law of Exemption 5.  It argues that none of the withheld information is "purely factual."  Specifically, the Agency contends that facts contained in the deliberative portions of the reports "were identified, extracted, and highlighted out of other potentially relevant facts and background materials by the authors, in the exercise of their judgment," and thus that material is exempt as well.  CIA Reply 13 (quoting Lutz Decl. ¶ 45).

The CIA appears to be importing the attorney work-product privilege's more lenient standards governing factual material into the deliberative process privilege analysis.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005) ("[F]actual material is itself privileged when it appears within documents that are attorney work product.").  The problem, of course, is that the CIA has relied on an entirely different privilege, and this Circuit's jurisprudence makes clear that facts in a predecisional document must be segregated and

disclosed.  *See, e.g.*, *Ryan v. Dep't of Justice*, 617 F.2d 781, 791 (D.C. Cir. 1980) ("We conclude

that the requested documents are exempt from FOIA disclosure under Exemption 5, except for

factual segments which do not reveal the deliberative process and are not intertwined with the

policy-making process."), *overruled on other grounds by Dep't of Interior v. Klamath Water

Users Protective Ass'n*, 532 U.S. 1 (2001); *Mead Data Cent., Inc. v. Dep't of Air Force*, 566

F.2d 242, 260 (D.C. Cir. 1977).

Accepting the CIA's arguments and importing the attorney work-product privilege's

standards for factual material into the deliberative process privilege would eliminate the fact

exception to the latter privilege.  Every government document involves the selective

identification, extraction, and analysis of particular facts.  This quality, alone, cannot justify the

withholding of purely factual information as "deliberative."  FOIA exemptions, after all, must be

"narrowly construed."  *Milner v. Dep't of Navy*, 131 S. Ct. 1269, 1262 (2011).

It is noteworthy that, in releasing the *Special Review*, the CIA was able to redact Agency

recommendations while segregating factual discussions for release.  *Compare Special Review*

69–72 (factual descriptions of unauthorized techniques) *with id.* at 106–09 (redacted

recommendations).  There is no reason to think the same process could not be completed for the

remaining eleven OIG reports.  In light of the ongoing dispute between the parties over whether

segregable facts remain, and in view of the CIA's inadequate justification for invocation of

Exemption 5, the Court should conduct an *in camera* review of the eleven withheld reports and

ensure that all segregable factual material is promptly made public.

### III.   The Court Should Hold Its Ruling on Documents 7 and 8 in Abeyance Pending the Imminent Conclusion of Mr. Durham's Investigation.

The CIA has now submitted a declaration from Special Prosecutor John Durham invoking Exemption 7(A) to withhold Documents 7 and 8, explaining that disclosing those documents would interfere with his ongoing criminal investigations.  Mr. Durham also explains that his investigations are "winding down and are expected to be concluded shortly."  Decl. of John Durham, ECF No. 21-1, ¶ 8.  Accordingly, the CIA's basis for withholding Documents 7 and 8 under Exemption 7 will soon expire.  Rather than dispute Mr. Durham's invocation of Exemption 7(A), Plaintiffs simply ask the Court to hold its rulings with respect to those two documents in abeyance until the conclusion of Mr. Durham's investigations.  At that point, the Court should require the CIA to disclose the segregable portions of those reports that describe the use of unauthorized interrogation techniques, such as mock executions, threats of death or sexual assault, and the like.

To be absolutely clear, Plaintiffs urge the Court to review those two documents *in camera*—to segregate factual descriptions of the unauthorized conduct—at the same time it reviews the other reports.  But Plaintiffs respectfully suggest that the Court hold any rulings requiring disclosure of that segregable material in abeyance until the conclusion of Mr. Durham's investigations.  Plaintiffs also request that the Court order the government to notify it within one week of the conclusion of Mr. Durham's investigations.[4]

---

[4] As Plaintiffs made clear in their summary judgment brief, they do not seek the names of CIA officers or confidential CIA source information.  Accordingly, Plaintiffs do not challenge the CIA's invocation of Exemptions 7(C), (D), and (E) to withhold names of CIA officers and confidential source information.

## CONCLUSION

For the foregoing reasons, this Court should order the CIA to release the portions of the OIG reports describing the use of unauthorized techniques.  In the alternative, and at a minimum, the Court should conduct an *in camera* inspection of the reports in order to satisfy its statutory obligation to conduct a *de novo* review of Agency withholdings and to ensure that all segregable information is released.

Respectfully submitted,

 /s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 457-0805
artspitzer@gmail.com

 /s/ Mitra Ebadolahi
Mitra Ebadolahi (*pro hac vice*)
Alexander A. Abdo (*pro hac vice*)
Jameel Jaffer (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7305
Fax: (212) 549-2654
mebadolahi@aclu.org

March 20, 2012                              *Counsel for Plaintiffs*

22